Filed 5/4/22  Makaden, Inc. v. D.R. Horton L.A. Holding Co., Inc. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MAKADEN, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> D.R. HORTON LOS ANGELES HOLDING COMPANY, INC., <br><br> Defendant and Appellant. | D079418 <br><br><br> (Super. Ct. No. RIC1511181) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING <br><br><br> NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on April 26, 2022, be modified as follows:

1.      In the first sentence of the second full paragraph on page 2, the phrase "Horton cross-appeals" is deleted and the phrase "Horton appeals" is inserted in its place.

2.      In the last sentence before the DISCUSSION on page 22, the word "cross-appealed" is deleted, and the word "appealed" is inserted in its place.

3.     In the first sentence under the subheading "C.  *The JNOV Motion*" on page 35, the phrase "On cross-appeal" is deleted, and the phrase, "In Horton's appeal," is inserted in its place.

4.     In footnote 12, the word "cross-appeal" is deleted, and the word "appeal" is inserted in its place.

5.     In footnote 15, the word "cross-appeal" is deleted, and the word "appeal" is inserted in its place.

6.     In the second to last sentence in the first paragraph on page 41, the word "cross-appeal" is deleted, and the word "appeal" is inserted in its place.

7.     In the DISPOSITION, the citation "(Cal. Rules of Court, rule 8.278(a)(1) & (2).)" is deleted, and the citation "(Cal. Rules of Court, rule 8.278(a)(3).)" is interested in its place.


There is no change in judgment.

The court construes Appellant Makaden's request to modify the award of costs as a petition for rehearing.  The petition is denied.


HALLER, Acting P. J.


Copies to: All parties

2

Filed 4/26/22  Makaden, Inc. v. D.R. Horton L.A. Holding Co., Inc. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MAKADEN, INC.,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>D.R. HORTON LOS ANGELES HOLDING COMPANY, INC.,<br><br>Defendant and Appellant. | D079418<br><br><br><br>(Super. Ct. No. RIC1511181) |

APPEAL from orders of the Superior Court of Riverside County, David Chapman, Judge.  Affirmed.

John L. Dodd & Associates and John L. Dodd for Plaintiff and Appellant.

Schneider & Branch, David K. Schneider; Williams Iagmin, and Jon R. Williams for Defendant and Appellant.


INTRODUCTION

This case arises out of a longstanding dispute between Makaden, Inc. (Makaden) and D.R. Horton Los Angeles Holding Company, Inc. (Horton) regarding a profit participation agreement in a residential land development

deal. The parties have now tried the case twice before different juries. The second jury returned a verdict in favor of Makaden for $1,279,513 and the trial court awarded Horton pre-judgement interest in the resulting judgment.

Horton filed several posttrial motions, including a motion for a new trial, in which it asserted the jury's verdict was not supported by substantial evidence, an alternative motion for judgment notwithstanding the verdict (JNOV), and a motion to vacate the portion of the judgment awarding prejudgment interest. The trial court granted the motion for a new trial, finding the jury relied on a calculation of damages presented by Makaden's expert that was erroneous for several independent reasons, but denied the motion for JNOV. In a separate order, the trial court vacated the award of prejudgment interest, after concluding the amount of damages was not certain or capable of being made certain before trial.

Makaden appeals from the trial court's orders granting a new trial and vacating the award of prejudgment interest, and Horton cross-appeals from the order denying its JNOV motion. We conclude the trial court did not abuse its broad discretion in granting the motion for a new trial and did not err in denying the JNOV motion. We also agree with the trial court that the amount of damages was not certain or capable of being made certain before trial and, thus, prejudgment interest was not appropriate in this case.

Finally, Makaden asks us to address the trial court's grant of Horton's motion for nonsuit, at the close of evidence, on Makaden's cause of action for breach of implied covenant of good faith and fair dealing. Review of a trial court's ruling on a nonsuit is through an appeal from the underlying judgment, but here there is no judgment as it was vacated when the trial court conditionally granted Horton's motion for a new trial and Makaden refused to accept the reduced remittitur on damages. We therefore decline to

provide what would essentially be an advisory opinion regarding the trial court's ruling on the nonsuit.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The Land Development Deal*

Makaden is a corporation owned entirely by Mike Doyle. Doyle owned 15 acres of land on three parcels in Riverside County. His brother owned an adjacent parcel of five acres. Doyle initially tried his hand at ranching on the undeveloped land, but not long after, the county redesignated the area for residential development. Doyle then began the process for obtaining a subdivision tract map for residential development on the collective 20 acres belonging to him and his brother. Seven years later, in 2007, Doyle obtained a tentative tract map to develop 59 lots across the 20 acres and began negotiating with potential homebuilders, including Horton. By then, Doyle's brother had sold his five acres to Ronald and Frances Kipper.

Around the same time, in 2006 or 2007, Doyle borrowed about $3.3 million against his land. The first, and primary, loan was from Gary E. Cox & Friends, LLC (Cox) for approximately $2.8 million and the second was from another lender for approximately $500,000. Doyle ran into financial trouble, and within a year or two, he stopped making payments on the loans and filed for bankruptcy. Cox initiated foreclosure proceedings on the $2.8 million loan and, as of July 16, 2010, held title to Doyle's 15 acres (the Cox Property).

However, because Doyle had already done considerable work in obtaining the tentative tract map and marketing the property to potential developers, Cox agreed to allow him to continue to negotiate the potential sale of the land. The Kippers also agreed to allow Doyle to negotiate the sale

of their five acres (the Kipper Property) as part of the land development project.

Horton had expressed an interest in purchasing the land to build the tract homes. Doyle began negotiating with David Stearn, Horton's Senior Vice President of Acquisitions and Planning. Stearn understood Doyle was proposing a deal that would include the entire 20 acres, along with the tentative tract map. Although the map added significant value to the land, Doyle's proposed purchase price was more than Horton was willing to pay. To bridge the divide, Stearn proposed a profit participation agreement that would allow Doyle to share in the profits if the residential development project was successful.

On August 23, 2010, Stearn sent Doyle a written letter of intent "to acquire the aforementioned property ('Property'), from Michael & Christine Doyle and Ronald & Francis Kipper ('Seller')" on behalf of Horton. At the time, Stearn did not know that Cox actually held title to the Cox Property. The letter's subject line identified the " 'Property' " as "Tract Map #32813 - 59 lot final map - 7200 SF min., lots in Temecula, CA." (Boldface omitted.) The letter stated the "Purchase Price for the lots" would be **"$4,900,000 ($83,051/lot)**."[1] The letter also included a term for profit participation, which provided that the "Seller" would receive "one half (50%) of all profits over a threshold of 22% Gross Margin."

Stearn subsequently learned that Cox held title to the Cox Property. He then told Doyle that any profit participation agreement with Doyle would need to be in the land purchase contract with Cox, since Cox was the property owner. And any assignment of the profit participation agreement from Cox

_____

[1]     Except where otherwise indicated, all boldface is in the original.

to Doyle would be between Cox and Doyle. Stearn also told Doyle that Horton would need a copy of the assignment before approving the land purchase contracts with Cox and the Kippers.

II.

*The Contracts*

A.   *The Assignment Agreement*

In February 2011, Cox and Makaden entered into an "Assignment Agreement" (Assignment Agreement). Although Cox had not yet contracted with Horton for the sale of the Cox Property, the recitals in the Assignment Agreement stated Cox had "entered into a Contract of Sale as the Seller with [Horton], as the Purchaser." The recitals further stated that Cox agrees to sell, and Horton agrees to purchase, the Cox Property for $3.3 million and, in addition, Horton "agrees to pay certain Profit Participation, if any, to Seller as described under Section 1.04."

Cox then agreed to assign certain rights under the contemplated contract of sale with Horton to Makaden, as follows:

> "1.   Assignment. For good and valuable consideration, receipt of which is hereby acknowledged by [Cox, Cox] hereby assigns to [Makaden] all right, title and interest to sale proceeds in excess of $2.9 million on the net that [Cox] receives. On the sale proceeds net amount between $2.6 million and $2.9 million, [Makaden] will receive three percent of the proceeds. Any net sale proceeds under $2.6 million [Makaden] will not receive compensation out of escrow, but [Makaden] will receive its share in the Profit Participation as set forth in the Contract of Sale for the real property described on Exhibit A as more particularly delineated in Section 1.[0]4 of the Purchase and Sale Agreement, said assignment of the foregoing conditioned upon certain events described hereinbelow."

Doyle gave the signed, notarized Assignment Agreement to Stearn at a budget meeting with Horton in March 2011. A month after the Assignment

5

Agreement was executed, Horton signed land purchase contracts with both Cox and the Kippers.

B. *The Cox Contract of Sale and the PAPA Provision*

In March 2011, Horton entered into a "Contract of Sale" with Cox (Cox Contract of Sale). It identified Cox as the " 'Seller' " and Horton as the " 'Purchaser.' " Section 1.01, subdivision (a), stated:

> "Seller hereby agrees to sell and convey unto Purchaser, and Purchaser hereby agrees to purchase and take from Seller, the real property in the County of Riverside (the 'County'), California, more particularly described in **Exhibit A** . . . together with all improvements[, rights, appurtenances, easements, privileges, entitlements, rights-of-way] (all of such real property, rights, and appurtenances being hereinafter referred to collectively as the 'Property')."

The attached Exhibit A provided the legal description of the Cox Property, consisting of the three parcels totaling 15 acres. Section 1.01, subdivision (a), further stated:

> "The Property together with the adjacent real property ('**Kipper Property**') described on **Exhibit A-1** are planned for 59 lots of land under Tract Map 32813 (the '**Lots**'). Purchaser is negotiating or has entered into a contract of sale to purchase the Kipper Property from the owner thereof ('**Kipper Contract of Sale**')."

The Cox Contract of Sale further provided, in section 1.02, that: "Seller shall sell, and Purchaser shall purchase, the Property for Two Million Nine Hundred Five Thousand Dollars ($2,905,000) (the '**Purchase Price**'). In addition to the Purchase Price, Purchaser agrees to pay Profit Participation, if any, to Seller in accordance with Section 1.04."

Section 1.04 of the Cox Contract of Sale is the profit participation provision (the PAPA provision). It is titled "PROFIT PARTICIPATION FOR THE LOTS" (capitalization in original) and provided, in relevant part:

6

"Seller shall be entitled to receive fifty percent (50%) of any Gross Profit (as defined on **Schedule 1** attached hereto) that exceeds a twenty-two percent (22%) Gross Profit Margin (as defined on **Schedule 1** attached hereto) on the sale of all of the single-family residences to be developed by Purchaser on the Lots, including the Lots within the Kipper Property ('**Profit Participation**')."

Schedule 1, in turn, set forth a formula that defined "Gross Profit" as equaling "A – (B+C+D)" (the PAPA formula). Each of the variables in the PAPA formula were defined as follows:

"A = Sales Revenue

[¶] Defined as the sum of the sales price of each residence pursuant to a sale to a member of the home buying public as reflected on the Home Closing Statement for such residence, including any premium for location, elevation, view or lot size, but excluding prices for extras and options offered by Purchaser in connection with the sale of any residence, including special or upgraded amenities, floor plan modifications, room options, appliance upgrades, cabinetry upgrades, countertop upgrades, finish carpentry upgrades, electrical options, fireplace options and all other options and upgrades, and minus sales incentive or concessions given to the home buyer.

B = Land & Improvements

[¶] Defined as *Purchase Price paid to Seller for each Lot* plus all escrow, title and closing costs, costs of third parties in connection with due diligence review of the Property, brokerage commissions and legal fees, incurred and paid by Purchaser in connection with the acquisition of title to the Lot; additional improvements by Purchaser (see Schedule l-B) . . . the costs of non-recurring, capitalized indirect construction costs (which for the purposes of this agreement shall be 1.50% of Sales Revenue) . . .

C = Sticks and Bricks

[¶] Defined as hard construction cost items and fees paid at building permit (see Schedule l-A).

7

D = Other Costs

[¶] Defined as all costs paid by Purchaser in connection with the close of escrow for the sale of residences to members of the home-buying public, including, but not limited to, closing costs, including normal escrow and title charges and property taxes, documentary transfer tax, buyer referral fees, Homeowner Associate Fees, third-party co-broker real estate commissions, and a warranty expense accrual calculated at 1.0% of the sales price for detached product and 1.5% for attached product." (Italics added.)

C.    *Conditions Precedent to Closing*

The Cox Contract of Sale further provided the "Purchaser's obligation to close the purchase of the Property is expressly conditioned upon the . . . conditions precedent" that (1) the "close of escrow under the Kipper Contract of Sale occur[ ] concurrently with the Closing" of escrow under the Cox Contract of Sale and that (2) "the County has determined in writing that Final Tract Map 32813 that will create the 59 Lots is ready for approval."

Ronald and Frances Kipper also executed the Kipper Contract of Sale with Horton in March 2011, and it also contained the same two conditions precedent for closing under their contract. The Kipper Contract of Sale was essentially identical to the Cox Contract of Sale, but it did not include a PAPA provision.

D.    *The Fifth Amendment to the Cox Contract of Sale*

Horton and Cox subsequently executed a number of amendments to the Cox Contract of Sale. Relevant here, the fifth amendment, executed in July 2011, reduced the purchase price to $2,825,000, and reduced the percentage of gross profit to determine the profit share under the PAPA provision from 50 percent to 35 percent. Stearn emailed the fifth amendment to Cox, and

8

confirmed it reduced the purchase price and profit participation share. Although Horton and Cox were aware that Cox had assigned the PAPA provision to Makaden, neither informed Doyle, nor anyone else at Makaden, of these amendments.

In January 2013, Doyle emailed Stearn and requested a copy of the final agreement between Horton and Cox "so [he] can confirm the profit sharing terms are the original terms that [he] was assigned." Stearn responded that he would send the agreement and told Doyle, "[t]here are six amendments, but I don't think any involve the PAPA" provision. Based on Stearn's statement, Doyle did not read all six amendments.

## III.

### *Dispute Over Doyle's Profit Share*

Horton eventually built and sold homes on 59 lots across the entire 20 acres that was the Cox and Kipper properties. The development project, named "Morgan Heights," was completed in 2015. On July 23, 2015, approximately 90 days after escrow closed on the last house in Morgan Heights, Horton made a payment of $44,548 to Doyle for his share of the profits under the PAPA provision. Horton arrived at that amount by using its total purchase price for all 59 lots across *both* the Cox and Kipper properties.

Doyle thought "there was a mistake." He had expected his share of the profits to be significantly higher, so he asked Horton to provide an accounting. Horton agreed to provide more information and also sent Doyle a copy of the fifth amendment to the Cox Contract of Sale. Doyle also inspected Horton's records. It was then that Doyle first learned the percentage of his profit share under the PAPA provision had been reduced from 50 percent to

9

35 percent. When the parties were unable to agree on the amount of profits owed to Makaden, Makaden sued.

In September 2015, Makaden filed a complaint against Horton for breach of contract, breach of covenant of good faith and fair dealing, and accounting, among other causes of action.[2] The complaint alleged Horton breached the PAPA provision in the Cox Contract of Sale, which Cox had assigned to Makaden, by failing to provide a complete accounting and failing to pay "the appropriate amount of profit to be shared with [Makaden], believed to be in excess of $4,500,000." It further alleged Horton "breached the implied covenant of good faith and fair dealing arising out of the agreements between the two parties by failing to perform its obligations set forth specifically in the agreements," namely the Cox Contract of Sale and the assignment of the PAPA provision to Makaden. Makaden also sought damages for the breach of covenant of good faith and fair dealing "in excess of $4,500,000."

IV.

*Trial*

The case was tried twice.

A.    *First Trial*

In the first trial, after certain legal issues of contract interpretation were bifurcated for a bench trial,[3] a jury awarded Makaden $850,000 in

---

[2]    These other causes of action were eliminated by rulings of the trial court and are not at issue in the present appeal.

[3]    In the bifurcated bench trial, the trial court decided three specific issues:  1) approximately $2 million in " 'sales incentives or concessions given to the homebuyer' " were deductible from the "A = Sales Revenue" category; 2) another approximately $2 million in " 'house-related fees' " were deductible as an allowable "B = Land and Improvements" expense; and 3) the Cox

10

damages. The trial court then granted Horton's motion for a new trial, on several grounds. The court found, "[a]s the primary basis for granting the motion," that "the jury's verdict of $850,000 [wa]s not supported by substantial evidence." The court found that Makaden "failed to identify specific evidence in the record that could lead the jury to its verdict." As a second and alternative basis for granting the motion, the court found "it [wa]s uncontroverted that the jury discussed and considered improper material, . . . including [Horton's] wealth and ability to pay, sympathy for [Makaden], and research conducted outside of their deliberations." Horton also filed a motion for JNOV, which the trial court denied.

B.    *Second Trial*

The parties tried the case again, but this time, Makaden raised a new theory of calculating damages. Makaden had retained a new damages expert and asserted, for the first time, that the PAPA provision limited Horton to deducting *only* the purchase price of $2,905,000[4] it paid for the Cox Property, and excluded the cost of purchasing the Kipper Property, to calculate the distributable gross profits. In all of its prior calculations, Makaden had also included Horton's purchase price for the Kipper Property as a deductible land

---

Contract of Sale, as amended, called for 35 percent profit sharing over the 22 percent gross profit margin threshold. As to these specific issues, the court found there was no ambiguity in the Cox Contract of Sale. However, the court made no determination as to whether the amendment was enforceable against Makaden. The court also stated it would address the issue of whether the profit share should be calculated based on actual costs and revenues, as opposed to budgeted costs and revenues, in a motion in limine.

[4]    Although the Cox Contract of Sale was amended to reduce Horton's purchase price from $2,905,000 to $2,825,000, Makaden continued to rely on the original purchase price of $2,905,000 in its calculations at trial.

11

cost.  The new theory would increase Makaden's claim for damages by more than $600,000.

Horton filed a motion in limine to exclude evidence or testimony concerning this new theory.  It asserted that in the "entire 8-year history of the PAPA [provision]," including four years of litigation, Makaden had never contested that the profit share calculation would be based on Horton's total cost of purchasing all 59 lots across the 20 acres under both the Cox and the Kipper contracts of sale.  Horton argued Makaden should be precluded from making this "eleventh-hour-back-flip" that the PAPA provision required Horton to use only the purchase price for the Cox Property (consisting of 43 lots) and to exclude the purchase price for the Kipper Property (consisting of 16 lots), on three grounds.  First, Makaden's new argument relied on "one arguably ambiguous provision" in the PAPA provision, that the "*Purchase Price paid to Seller* for each Lot" meant only the purchase price paid to Cox as the "Seller" under the Cox Contract of Sale.  (Italics added.)  Second, Makaden's new interpretation of the agreement was contrary to its prior position for the past eight years and third, it was "contrived and unreasonable per se."

The trial court denied Horton's motion without prejudice.  It essentially deferred any ruling until evidence was presented at trial, stating that the interpretation of the contract was not yet before it.

At the second trial, the parties disputed three issues that affected the amount owed to Makaden under the PAPA provision:  (1) whether Horton's total purchase price for all 59 lots on the 20 acres (in the amount of

12

$4,060,000[5]) should be deducted to determine distributable gross profits, or whether the purchase price of only the 43 lots under the Cox Contract of Sale (in the amount of $2,905,000) should be deducted; (2) whether $241,222 in indirect costs and $95,416 in committed costs should also be deducted from gross profits before calculating each party's profit share; and (3) whether Makaden was entitled to a 50 percent or 35 percent share of the final gross profits, however calculated, based on the fifth amendment to the Cox Contract of Sale.

  1. *Evidence at Trial*[6]

    a. *Mike Doyle*

Doyle testified that, although Cox held title to the land, he had put extensive effort into developing the tentative tract map, which significantly increased the value of the land. For that reason, both Cox and Horton agreed to keep Doyle involved in the sale of the land, and to compensate him for his efforts on the land development deal with Horton. Doyle received a finder's fee from Horton for facilitating its purchase of the Cox and Kipper properties, and Cox agreed to pay him a portion of the proceeds of sale above a certain percentage and to assign the PAPA provision to him.

Horton was aware that Cox was assigning the PAPA provision to Makaden, and asked Doyle to confirm the assignment was complete before executing the Cox Contract of Sale. Doyle participated in early budget projection meetings with Horton and based on the numbers presented by

---

[5] The parties agreed that Horton actually paid a total amount of $4,060,000 for the entire 20 acres of land.

[6] We summarize the testimony and evidence most relevant to the issues on appeal and do not include all witnesses, testimony, or evidence.

Horton, expected his share of the profits under the PAPA provision to be significantly more than the $44,548 he ultimately received. He did not learn that his 50 percent share had been reduced to 35 percent until after he received the payment from Horton.

On cross examination, Doyle testified he understood Horton was buying the entire 20 acres, comprised of both the Cox and Kipper properties, in two transactions, to facilitate development of the entire 59 lot tract map. He conceded he understood the PAPA formula included "all the costs and expenses for the 59 lots." Specifically, at the time he executed the Assignment Agreement, he understood "the land costs for all 59 lots was going to be included in the PAPA calculation," because "[t]hat's what Horton had told [him]." He admitted the "idea" of using only Horton's cost in acquiring the Cox Property to calculate his profit share came just before the second trial. Indeed, up until approximately 40 days before the second trial, Doyle used the "entire land costs" to Horton of over $4 million in preparing his own spreadsheets to calculate the amount he was owed under the PAPA provision.

b. *David Stearn*

Stearn testified he was tasked primarily with locating and acquiring new properties for residential home developments for Horton. He met Doyle in that role and understood Doyle was negotiating the sale of both the 15 acres of land that Cox owned and the additional five acres owned by the Kippers. Stearn testified the tentative tract map made the land significantly more valuable, and that it was always his intention to include the entire cost of all 20 acres of land in the PAPA calculation. He further explained the tract map covered all 20 acres, that some of the lots were situated in such a manner as to run across more than one parcel, and that the contracts were

14

set up such that none of the deals would go through if Horton was not able to purchase the entire 20 acres. Finally, he explained both the contracts, with Cox and the Kippers, employed standard language and testified he believed section 1.01, subdivision (a) of the Cox Contract of Sale "shows [Horton's] intent," but acknowledged "it could have been altered to be more specific."

He also acknowledged he was aware that Cox had assigned the PAPA provision to Makaden when Horton and Cox amended the Cox Contract of Sale to decrease the profit share participation rate from 50 percent to 35 percent under the PAPA provision. He did not contact Doyle to let him know about the amendment, and did not seek Doyle's approval, because, as he understood it, Horton's contract was with Cox, not Doyle or Makaden. He further explained: "[W]hile I did understand that it impacted Mr. Doyle, Horton was not concerned as to which party [was] impacted. Our contract was with [Cox] which was subsequently assigned to Mr. Doyle, and that was our fiduciary duty to make the deal work, or there was no deal."

c. *Robert Taylor*

Taylor testified as Makaden's expert witness in the field of forensic accounting. He was a new expert retained for the second trial. Makaden asked Taylor to calculate the amount of money Horton owed Makaden under the PAPA provision. To do so, Taylor considered financial information from Horton, including a job cost report that listed all of the costs incurred by the project; information from Horton's expert, Brian Bergmark; and "three primary assumptions" Makaden asked him to make. First, he assumed Horton's land cost was limited to the purchase price of $2,905,000 under the Cox Contract of Sale only. Second, he assumed Makaden was entitled to 50 percent of gross profit that exceeded the 22 percent gross profit margin. And third, he excluded certain homebuyer options and upgrades from the net

15

revenue and costs. Based on those assumptions, Taylor determined that Horton owed Makaden either $1,279,513, based on the original profit participation rate of 50 percent, or $882,295 if the percentage was reduced to 35 percent.

Taylor used many of the same numbers as Horton in performing his calculation of the amount owed to Makaden. However, his calculation differed from Horton's in several specific ways. First, as noted, Taylor used the $2,905,000 land cost, instead of Horton's figure of $4,315,009.[7] Second, Taylor also identified what he believed to be errors in some of Horton's numbers based on his review of the job cost report. Relevant here, one adjustment Taylor made was for a "Possible Double Count of Capitalized Indirect Costs." Under the PAPA formula, the variable "B = Land & Improvements" allowed Horton to deduct "the costs of non-recurring, capitalized indirect construction costs (which for the purposes of [the PAPA provision] shall be 1.5[ ]% of Sales Revenue)." Taylor explained that Horton included the 1.5 percent of the selling price as capitalized indirect construction costs, as permitted by the PAPA provision, but the job cost report also had a column called "Capitalized Indirect Costs" with a total amount of $241,222, which Horton also included as a separate development cost figure. Taylor opined, based only on the title of the column in the job cost report, that the $241,222 was duplicative of costs estimated by the 1.5 percent capitalized indirect construction costs figure and, therefore, should have been excluded. In other words, it was his opinion that Horton had double-counted $241,222 of deductible indirect costs. Taylor also opined that

_____

[7]    As we explain later, Horton presented evidence that the total purchase price reflected in its accounting system was $4,315,009.

16

Horton improperly included an additional $95,000 of committed costs based on an estimate for charges that would be, but had not actually been, incurred.

On cross examination, Taylor testified, based on the job cost report, that the $241,222 in indirect costs included, among other items, temporary power, temporary construction, architecture, blueprints, structural engineering, street cleaning, temporary fencing, and chemical toilets.  He conceded he did not know "everything that went into the overall [1.5 percent] provision" and, thus, did not know for sure whether Horton actually double-charged any particular cost.  He further conceded that he would need to change his opinion if the additional $241,222 was not subsumed within the general 1.5 percent provision.

> d.    *Marilyn Andrea*

Andrea was Horton's Chief Financial Officer.  She explained the calculation Horton used to determine the $44,548 amount paid to Makaden under the PAPA provision.  She used the land cost for each individual lot, 59 in total, which totaled $4,315,009.  She did not use the purchase price set forth in the Cox and Kipper contracts of sale and instead, used the land price for each individual lot as reflected in Horton's accounting system.  She did not "look behind" the numbers generated by the accounting system for any of the amount used in the PAPA payment calculation, but explained that Horton did hold regular budget meetings in which the numbers were reviewed.  Andrea calculated the PAPA payment using 35 percent over the 22 percent gross profit margin, because that was the percentage in the final PAPA provision.

With respect to the $241,222 in allegedly double-counted indirect construction costs, Andrea explained those costs included individual items listed as potential deductions in the PAPA calculation, such as temporary

17

power, temporary fencing, blueprints, consulting fees for architects and structural engineers.  She then testified:

> "Q. . . . Are you familiar that there is an issue in the case as to whether or not there was some double accounting for some certain expenses involving a temporary power, blueprints, structural and architect, engineering, chemical toilets, those sort of items?
>
> "A.  Yes.
>
> "Q.  Were those items included in the other category that was titled Indirect Costs? In other words, did you double pay, did Horton double pay on those, double count them?
>
> "A.  No."

She further explained that the costs included in the 1.5 percent under "B" of the PAPA formula were "superintendents salaries, salesperson's salaries or commissions, it is model maintenance, be it cleaning the models, landscape, just any costs that were not part of the job cost expense or of the job cost report but were related to the project."

### e.  *Brian Bergmark*

Bergmark, Horton's expert in forensic accounting, testified he reviewed Horton's accounting underlying the PAPA payment made to Makaden.  He sampled various data points and confirmed each was consistent with the accounting information Horton provided.  In addition, he opined the $241,222 in indirect costs that Taylor claimed were double-counted were, instead, additional cost items specifically included as costs in Schedule 1 of the Cox Contract of Sale.  Considering all of the data he reviewed, he concluded there was nothing incorrect with Horton's calculation.

### 2.  *Horton's Motion for Nonsuit and Request for Special Jury Instruction*

At the conclusion of the evidence, before closing argument, Horton presented a motion for nonsuit on the breach of covenant of good faith and

fair dealing cause of action and a request for a special jury instruction. Horton asserted Makaden could not pursue both a breach of contract and a breach of implied covenant cause of action because the facts and damages alleged by Makaden for both were identical. Makaden opposed the motion and asserted, "a party who claims discretionary ability over another in a contract is still held to the standard of good faith, even in acts that do not expressly violate . . . the terms of the contract, but otherwise interfere and frustrate [the] purpose of the contract." Even if there was no provision precluding Horton from modifying the Cox Contract of Sale, Makaden asserted it should be able to argue the modification from 50 percent to 35 percent was a breach of the implied covenant of good faith and fair dealing.

The trial court determined this was a case where one party was assigned rights from a principal contract, by a separate contract, without any agreement that the principal contract would not be modified. In contrast, the cases that Makaden relied on were inapposite because they addressed situations in which one party had unilateral discretion under the terms of a single contract. The court further noted the Cox Contract of Sale had not yet been executed at the time Doyle and Cox entered into the Assignment Agreement, stating: "I do not believe that you could have a breach of the implied covenant of good faith and fair dealing on a contingency that might arise in the future on a contract that has not yet come into existence." The court therefore granted Horton's motion for nonsuit.

In its request for a special jury instruction, Horton asked the trial court to instruct the jury on three issues it asserted were matters of contract interpretation for the court: 1) that sales incentives, allowances, and concessions were deductible costs under the PAPA provision; 2) that permit fees, site fees, and other fees were deductible costs under the PAPA provision;

19

and 3) that the full land purchase price paid by Horton to buy all 59 lots, including the amount paid to the Kippers, should be deducted. Regarding the third point, Horton asserted the evidence at trial demonstrated both parties always intended to use the full purchase price of all 59 lots, and that the court should give effect to the intentions of the parties at the time of contract. In opposition, Makaden asserted the term " 'Purchase Price' " in the Cox Contract of Sale was not ambiguous but, to the extent there was any ambiguity, that matter fell to the province of the jury because it required consideration of conflicting extrinsic evidence.

The trial court denied Horton's request for a special jury instruction. Specifically, with respect to whether the purchase price included all 59 lots or not, the court explained: While the plaintiff would not "be allowed to tell this jury that they get to go back and interpret the meaning of the contract. What they can say is the contract says blank. And the only factual conclusion to arrive from that language is this is the purchase price. That is not asking them to interpret the contract or ambiguity, it is asking them to determine the fact. And the fact is does the purchase price include all 59 lots or only the Cox lots."

3. *Verdict and Post-Trial Motions*

The jury found in favor of Makaden and awarded damages in the amount of $1,279,513—the exact amount Taylor had calculated based solely on the purchase price of the Cox Property and the original profit participation rate of 50 percent. The trial court entered judgment based on the verdict, and also awarded Makaden prejudgment interest at the legal rate of 10 percent per annum from July 23, 2015.

Horton filed a motion for JNOV or, in the alternative, for a new trial, and a motion to vacate the verdict with respect to the prejudgment interest.

20

Horton argued the jury's verdict was based on an erroneous calculation presented by Taylor, and thus the verdict was not supported by substantial evidence. It asserted there was insufficient evidence to support Taylor's calculation because Taylor failed to deduct the following three items in full: 1) the $241,222 in allegedly double-counted indirect costs; 2) the $95,416 in allegedly unpaid costs; and 3) the full land purchase cost of $4,060,000. For the purposes of the posttrial motions, Horton did not dispute the use of a 50 percent participation rate, as opposed to 35 percent, in calculating the amount owed to Makaden under the PAPA provision. Horton asserted the three deductions would reduce the verdict from $1,279,513 to $533,694, and asked the court to enter judgment in the corrected amount. In the alternative, Horton asked the court to order a new trial on the limited issue of damages.

After hearing argument, the trial court agreed "[t]he jury verdict was based on an erroneous calculation of the project profits by failing to deduct the project's full land purchase costs of $4,060,000; the indirect costs of $241,222[;] and committed costs of $95,416." In its tentative ruling, which the court adopted and read into the minutes, the court stated that it had "independently weighed the evidence and evaluated the credibility of the witnesses." It found that the evidence, including testimony from Doyle, established the parties had always intended the PAPA calculation would include the entire land costs for all 59 lots. As to the $241,222 deduction, the court credited Andrea's testimony that the costs were not duplicative, over Taylor's assumption that they were. Accordingly, the court conditionally granted a new trial as to damages, unless Makaden accepted remittitur of the damages award from $1,279,513 to $533,694. The parties declined to present

21

additional argument on the JNOV, and the court adopted its tentative ruling denying the motion.

Finally, Horton asked the trial court to vacate the award of prejudgment interest because the amount of damages was not certain or capable of being made certain as required by Civil Code section 3287, subdivision (a). The trial court agreed. It found, while the PAPA provision included a formula, there were factual disputes as to the numbers to be used in that formula, and those disputes directly affected the amount of damages. The court therefore granted the motion to vacate the judgment with respect to the award of prejudgment interest.

Makaden timely appealed from the order conditionally granting a new trial on damages and the order vacating the portion of the judgment awarding pretrial interest. Horton then cross-appealed from the order denying its JNOV motion.

## DISCUSSION

On appeal, Makaden asserts the trial court erred by granting Horton's motion for a new trial on damages and by vacating the portion of the judgment awarding pretrial damages. Horton counters that the trial court ruled correctly on both motions, and further contends it should have granted the JNOV motion. Based on the applicable standards of review, we find no error in the trial court's rulings on any of the three posttrial motions. We also decline to address the trial court's ruling on Horton's motion for nonsuit, despite Makaden's request, because that issue is not properly within the scope of the present appeal.

# I.

## *The Trial Court Did Not Err By Granting Horton's Motion for a New Trial or By Denying Horton's JNOV Motion*

A.    *Relevant Legal Principles*

Code of Civil Procedure[8] section 657 governs motions for a new trial and provides that the trial court may vacate a jury's verdict, in whole or in part, and order a new trial on all or part of the issues, for any one of a number of reasons including, as relevant here, "[e]xcessive or inadequate damages" or "[i]nsufficiency of the evidence to justify the verdict."  Section 629 governs JNOV motions and provides, in part:  "The court, before the expiration of its power to rule on a motion for a new trial, . . . on motion of a party against whom a verdict has been rendered, shall render judgment in favor of the aggrieved party notwithstanding the verdict when a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made."  (§ 629, subd. (a).)

In ruling on a motion for a new trial, the trial court "is vested with the authority, for example, to disbelieve witnesses, reweigh the evidence, and draw reasonable inferences therefrom contrary to those of the trier of fact." (*Mercer v. Perez* (1968) 68 Cal.2d 104, 112–113 (*Mercer*).)  The standard for reviewing the trial court's ruling on appeal is well settled.  "After authorizing trial courts to grant a new trial on the grounds of '[e]xcessive . . . damages' or '[i]nsufficiency of the evidence,' section 657 provides:  '[O]n appeal from an order granting a new trial upon the ground of the insufficiency of the evidence . . . or upon the ground of excessive or inadequate damages, . . . *such*

---

8    All undesignated statutory references are to the Code of Civil Procedure.

23

*order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons.'* (Italics added.) Thus, . . . an order granting a new trial under section 657 'must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory.' [Citation.] Moreover, '[a]n abuse of discretion cannot be found in cases in which the evidence is in conflict and a verdict for the moving party could have been reached[.]' [Citation.] In other words, 'the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order.' " (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 411–412 (*Lane*).)

The trial court does not have such broad discretion in ruling on a motion for JNOV. (See *Lane, supra,* 22 Cal.4th at p. 412.) " ' "A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is *no* substantial evidence in support. [Citation.] [¶] . . . As in the trial court, the standard of review [on appeal] is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion." ' " (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 192 (*Webb*), italics added.) Unlike a motion for new trial, the trial court may not reweigh the evidence or make credibility determinations when considering a JNOV motion. (See *Lane, supra,* 22 Cal.4th at p. 412; *Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 313–314, 336 (*Johnson & Johnson*) [applying *Lane*].) In reviewing a trial court's ruling on a motion for JNOV, we are similarly constrained. (*Johnson & Johnson,* at p. 313.) "We, like the trial court, may not reweigh the evidence or judge the credibility of witnesses." (*Ibid*.) We resolve all evidentiary conflicts and draw all

24

reasonable inferences in favor of the verdict and consider only whether there is any substantial evidence to support the verdict.  (*Id*. at pp. 313–314.)

B.    *The Motion for a New Trial*

In granting Horton's motion for a new trial, the trial court concluded there was insufficient evidence to support the jury's verdict because the only basis for the amount awarded was Taylor's calculation, and it improperly failed to deduct:  1) the $241,222 in allegedly double-counted indirect costs; 2) the $95,416 in allegedly unpaid costs; and 3) the full land purchase cost of $4,060,000.  Makaden does not dispute that the jury relied on Taylor's calculation in reaching its verdict (the jury awarded Makaden the exact amount calculated by Taylor), or the trial court's finding that the equation was improper because it failed to deduct the $95,416 in allegedly unpaid costs.  Makaden does contend the trial court erred on the other two points:  1) by concluding the contract permitted Horton to deduct the full land purchase cost of $4,060,000, and 2) by concluding the additional $241,222 was deductible, and not already included in the 1.5 percent standard deduction for capitalized indirect costs.  We conclude the trial court did not abuse its broad discretion to grant a new trial.

1.    *Deduction for the Full Land Purchase Price*

The calculation the jury relied on deducted only the $2,905,000 listed as the "Purchase Price" for the Cox Property under the Cox Contract of Sale.  The trial court concluded the calculation should have, instead, deducted the total land purchase price of $4,060,000, the full amount Horton paid for all 20 acres under the Cox and Kipper contracts of sale.  In reaching that conclusion, the court concluded the phrase "Purchase Price paid to Seller for each Lot," set forth in the PAPA formula (Schedule 1) to the Cox Contract of

25

Sale, was ambiguous. The court therefore relied on extrinsic evidence regarding the intent of the parties to resolve the ambiguity.

Makaden asserts the trial court erred because the phrase is not ambiguous, and instead, the plain language supports Taylor's assumption that "Purchase Price" in the PAPA formula was limited to the $2,905,000 paid to Cox. Horton contends, to the contrary, the plain language supports its position that the purchase price to determine its land acquisition costs included the full $4,060,000 Horton paid to acquire all 59 lots across the 20 acres. Alternatively, Horton asserts the contract is either ambiguous on its face or reasonably susceptible to more than one interpretation, and the undisputed extrinsic evidence required a finding that the purchase price included the full $4,060,000.

"The interpretation of a contract is a judicial function. [Citation.] In engaging in this function, the trial court 'give[s] effect to the mutual intention of the parties as it existed' at the time the contract was executed. (Civ. Code, § 1636.) Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms. (Civ. Code, § 1639 ['[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . .']; Civ. Code, § 1638 [the 'language of a contract is to govern its interpretation . . .'].)" (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125–1126 (*Wolf*).) Extrinsic evidence cannot be used to vary or contradict the unambiguous terms of a written, integrated contract but may be admissible to aid in the interpretation of an ambiguous term. (*Ibid.*)

"When the meaning of the words used in a contract is disputed, the trial court engages in a three-step process. First, it provisionally receives any proffered extrinsic evidence that is relevant to prove a meaning to which the

26

language of the instrument is reasonably susceptible. [Citations.] If, in light of the extrinsic evidence, the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid the court in its role in interpreting the contract. [Citations.] When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law. [Citations.] This is true even when conflicting inferences may be drawn from the undisputed extrinsic evidence [citations] or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation. [Citations.] If, however, there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by the jury." (*Wolf, supra,* 162 Cal.App.4th at pp. 1126–1127.)

"On appeal, a 'trial court's ruling on the threshold determination of "ambiguity" (i.e., whether the proffered evidence is relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact. [Citation.] Thus[,] the threshold determination of ambiguity is subject to independent review.' " (*Horath v. Hess* (2014) 225 Cal.App.4th 456, 464 (*Horath*).)

Here, as the trial court noted in the context of Horton's request for a special jury instruction, both parties offered extrinsic evidence regarding the interpretation of the contract without objection. The evidence was then admitted without the court making an express finding as to its admissibility to aid in the interpretation of the contract. Regardless, the question of whether the language of the contract is ambiguous, and thus whether it was appropriate for the trial court to consider the extrinsic evidence in the context of the motion for a new trial, remains a matter of law that we review de novo. (See *Horath, supra,* 225 Cal.App.4th at p. 464; *Wolf, supra,* 162 Cal.App.4th at pp. 1126–1127.) To the extent we conclude there is ambiguity in the

27

contract, and that the interpretation of the ambiguous term turns on conflicting extrinsic evidence, we defer to the trial court's weighing of the evidence as the trier of fact. (See *Wolf*, at p. 1127; *Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 636 [a reviewing court "defers to the trial court's resolution of conflicts in the evidence"].)

We begin by considering the threshold question of whether the language of the contract is ambiguous. We conclude that it is. Schedule 1 to the Cox Contract of Sale defined "Gross Profit" as "A – (B+C+D)" and defined "B" to include, among other costs, the "Purchase Price paid to Seller for each Lot." Makaden asserts there is no ambiguity because the capitalized term "Purchase Price" is specifically defined in the contract as $2,905,000, and the capitalized term "Seller" is specifically defined as Cox. So Makaden contends the "Purchase Price paid to Seller" is limited to the $2,905,000 Horton paid to Cox.

But the relevant phrase does not end there. Instead, it goes on to state "for each Lot." We do not focus on only a portion of the phrase, as Makaden would have us do, and instead read the entire phrase in the context of the entire agreement as a whole. (See *Wind Dancer Production Group v. Walt Disney Pictures* (2017) 10 Cal.App.5th 56, 69 (*Wind Dancer*) [" 'We consider the contract as a whole and interpret its language in context so as to give effect to each provision, rather than interpret contractual language in isolation.' "].) Doing so here, we note, as the trial court did, the contract also defined the capitalized term " '**Lots**.' " It stated: "The Property together with the adjacent real property ('**Kipper Property**') . . . are planned for 59 lots of land under Tract Map 32813 (the '**Lots**'). Purchaser is negotiating or has entered into a contract of sale to purchase the Kipper Property from the owner thereof ('**Kipper Contract of Sale**')." Thus, the term " '**Lots**' " is

28

specifically defined to include all 59 lots planned under the tract map, which, in turn, included the adjacent Kipper Property.

Considering the entire phrase in the context of the agreement as a whole, there is an inherent ambiguity between three defined terms: "Purchase Price," "Seller," and "each Lot." The plain language of the contract establishes the "Purchase Price" of $2,905,000 was paid to Cox, the "Seller," and that it was solely for the purchase of the Cox Property. But the contract further expressly stated that Horton would concurrently purchase the Kipper Property, and the Cox Property "*together*" with the Kipper Property "are planned for 59 lots of land under Tract Map 32813," which were collectively defined as "the 'Lots.' " (Boldface omitted, italics added.) Thus, the stated purchase price of $2,905,000 does not represent the total amount Horton "paid . . . for each Lot." Instead, the contract is reasonably susceptible to the interpretation urged by Horton, that the "Purchase Price paid to Seller *for each Lot*" also includes the additional purchase price paid to the other Seller, the Kippers, for the additional land necessary to develop all 59 Lots. (Italics added.)

Makaden asserts the Cox Contract of Sale was for the sale of three 5-acre parcels, not 59 individual lots. To the contrary, the contract itself specified the very purpose of the two concurrent land purchases was to develop the "59 lots of land under Tract Map 32813 (the '**Lots**')." Further, the disputed term, "Purchase Price paid to Seller for each Lot," appears in Schedule 1, which set forth the PAPA formula that was to be used *after* Horton developed all 20 acres and sold all of the homes on all 59 lots. As set forth in Schedule 1, the PAPA formula determined the Gross Profit by deducting the costs of development, including the "Purchase Price paid to Seller for each Lot," from the Sales Revenue, "[d]efined as the sum of the

29

sales price of *each resident.*" (Italics added.) Similarly, the cost of land to be deducted included the cost "for each Lot," not just the portion of the lots purchased from Cox. Certainly, the parties *could* have agreed to a calculation that gave Makaden the benefit of the sales revenue on *each* of the 59 homes without deducting the cost of *each* of the 59 Lots, but the language of the contract does not unambiguously state that is what the parties intended. Instead, we conclude the language is ambiguous on its face.[9]

Thus, the trial court properly considered extrinsic evidence relevant to the interpretation of the contract, and the extrinsic evidence at issue was directly relevant as it tended to prove the mutual intent of the parties at the time the contract was executed. (See Civ. Code, § 1636; *Wolf, supra,* 162 Cal.App.4th at pp. 1126–1127.) Makaden argues the trial court nevertheless erred by relying on the evidence because it directly contradicted the express terms of the contract. Again, Makaden focuses solely on the definition of "Seller" and asserts that term is expressly defined as Cox, and therefore is not reasonably susceptible to an interpretation that "Seller" includes both Cox and the Kippers. But as we have explained, the entire provision must be

---

[9] While we conclude the phrase "Purchase Price paid to Seller for each Lot" is ambiguous on its face, we note the extrinsic evidence also supports the conclusion that the phrase is susceptible to the interpretation offered by Horton. (See *Wolf, supra,* 162 Cal.App.4th at pp. 1126–1127.) Specifically, there is no dispute the Kipper Contract of Sale also defined the capitalized terms "Seller" and "Purchase Price," but that it defines those terms in the context of the sale of the Kipper Property. Although the Kipper Contract of Sale was not explicitly incorporated by reference into the Cox Contract of Sale, it is referenced in the Cox Contract of Sale and all parties knew, as stated in both contracts, that escrow for both properties needed to close concurrently. Thus, when considering the Kipper Contract of Sale, it is even more evident that the phrase "Purchase Price paid to Seller for each Lot" could be read to include the amount paid to the Kippers.

interpreted in the context of the agreement as a whole. (See *Wind Dancer, supra*, 10 Cal.App.5th at p. 69.) It is precisely the fact that the contract defined "Purchase Price" and "Seller" solely in the context of Horton's purchase of the 15 acres from Cox, while also defining " '**Lots**' " to include all 59 Lots spanning both the Cox and Kipper properties that creates an inherent ambiguity.[10]

Makaden concedes the extrinsic evidence demonstrated that Doyle "may originally have understood the Kipper property cost to be included." However, it contends Doyle's " 'undisclosed intent or understanding' " was irrelevant, in part because the contract was executed by Horton and Cox, not Doyle or Makaden. A party's *undisclosed subjective* intent generally is not relevant to the issue of contract interpretation, but the evidence at issue here did not relate to an undisclosed intent, and instead was relevant to the mutually disclosed intent of the parties at the time of contracting. (See *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955, 957.)

Here, there was ample evidence that the negotiations originally took place between Doyle and Stearn; that the PAPA provision, in particular, was included for Doyle's benefit; and that Doyle and Stearn both understood, from the beginning, that the PAPA calculation would include the full purchase price of all 20 acres. Indeed, Horton's August 23, 2010 letter of intent to purchase the entire 20 acres defined " 'Property' " as both the Cox and Kipper

---

[10] Makaden similarly asserts the contract had an integration clause and, therefore, extrinsic evidence could not be used to add to or vary its terms. (See *Masterson v. Sine* (1968) 68 Cal.2d 222, 225.) This argument fails for the same reason—the extrinsic evidence of the intent of the parties does not add to or vary its terms, and instead aids in interpreting an inherent ambiguity.

31

properties, " 'Seller' " as both "Michael & Christine Doyle and Ronald & Francis Kipper,"[11] and the "Purchase Price for the lots" would be "**$4,900,000 ($83,051/lot)**." Further still, Doyle testified—consistent with that understanding and the court's ultimate interpretation of the contract— that he himself used the total purchase price of over $4 million for all 20 acres to calculate the amount owed to him under the PAPA provision, up until approximately 40 days before the second trial. Thus, the evidence was relevant, and it was proper for the trial court to consider it when interpreting the ambiguous contract term. Makaden does not otherwise dispute the evidence supported the trial court's conclusion that the mutual intent of the parties was to include the entire $4,060,000 amount Horton paid to both Cox and the Kippers for "each Lot" in the PAPA formula.

In sum, we conclude the term "Purchase Price paid to Seller for each Lot" is ambiguous as a matter of law, and the trial court did not err by considering extrinsic evidence tending to prove a meaning to which the contract language is reasonably susceptible. Further, the trial court was entitled to weigh that evidence and conclude, as it did, that it supported Horton's proposed interpretation and, thus, that the jury based its verdict on an erroneous calculation that did not include a deduction of the entire land purchase price of $4,060,000. We defer, as we must, to the trial court's weighing of the evidence as the trier of fact. (See *Wolf*, *supra*, 162 Cal.App.4th at p. 1127.)

---

[11] As previously noted, Stearn did not know at the time he presented Horton's letter of intent to Doyle that Cox held title to the Cox Property.

2.     *$241,222 Deduction for Indirect Costs*

Makaden next contends there was not substantial evidence to support the trial court's finding that the damages calculation was erroneous for failing to include the additional $241,222 in indirect costs.  Not so.  Unlike the previous issue, the dispute over the $241,222 deduction was not based in contract interpretation and was, instead, purely a factual dispute.  As such, the trial court is entitled to significant deference.  As we have explained, " '[a]n abuse of discretion cannot be found in cases in which the evidence is in conflict and a verdict for the moving party could have been reached.' " (See *Lane, supra,* 22 Cal.4th at p. 412.)  This is such the case.

The only basis Makaden offered for excluding the $241,222 was Taylor's opinion, based solely on the title of the column in the job cost report, that the $241,222 was duplicative of costs estimated by the 1.5 percent capitalized indirect construction costs figure.  Taylor conceded he did not know "everything that went into the overall [1.5] percent provision" and, thus, did not know for sure whether Horton actually double-charged any particular cost.  He further conceded he would need to change his opinion if those costs were not subsumed within the general 1.5 percent provision.

Horton then offered substantial evidence that the $241,222 deduction was not double-counted.  Horton's CFO Andrea clarified:

> "Q.  And included on here, for example, the second item is temporary power; do you see that?
>
> "A.  Yes.
>
> "Q.  Was it your understanding that that would be an expense under the PAPA calculation?
>
> "A.  Yes.
>
> "Q.  Did you expense that in your PAPA calculation, the temporary power?
>
> "A.  Yes.

33

"Q. What about some of the consultant fees that are identified as architect and structural engineer, did you expense those?

"A. Yes.

"Q. What about things like temporary fencing and blueprints and toilets, did you expense those?

"A. Yes.

"Q. And is that different than the capitalized indirect costs that you mentioned a moment ago which are superintendent fees and those other items?

"A. Yes.

"Q. *Was there any double dipping or double counting on those expenses that I just identified compared to the indirect costs?*

"A. *No.*" (Italics added.)

Andrea addressed the issue again and testified further:

"Q. . . . Are you familiar that there is an issue in the case as to whether or not there was some double accounting for some certain expenses involving a temporary power, blueprints, structural and architect, engineering, chemical toilets, those sort of items?

"A. Yes.

"Q. *Were those items included in the other category that was titled Indirect Costs? In other words, did you double pay, did Horton double pay on those, double count them?*

"A. *No.*" (Italics added.)

Makaden asserts Andrea's testimony lacked foundation because it was not supported by documentary evidence. However, Makaden presents no authority on appeal, and we are aware of none, requiring documentary evidence to establish foundation. (Cf. Evid. Code, § 702, subd. (b) ["A witness'[s] personal knowledge of a matter may be shown by any otherwise admissible evidence, including his [or her] own testimony."].) Andrea testified she was the division CFO for the relevant geographical area. Her job duties for the past 10 years included working with the land department to

34

prepare "land books or new land acquisitions," with the sales department "doing sales releases," and performing all matters "accounting and finance related." Further, she attended budget meetings at least once per quarter. And based on her job experience, she was able to explain precisely what was included in the particular category of costs at issue. By contrast, the only thing Makaden offered to support Taylor's testimony was the title of the column on a job cost report he did not prepare. The trial court was entitled to find Andrea credible and to credit her testimony over Taylor's. (See *Mercer, supra,* 68 Cal.2d at pp. 112–113.) Doing so, it concluded the jury's calculation was erroneous for failing to deduct the additional $241,222 in indirect costs.

In sum, we conclude the trial court did not abuse its discretion by granting the motion for new trial on the ground there was insufficient evidence to justify the jury's verdict.

C.     *The JNOV Motion*

On cross-appeal, Horton asserts the trial court should have granted its companion JNOV motion,[12] thereby obviating the need for a third trial in this case. Although the argument has appeal from an efficiency standpoint, the governing standard of review makes clear the trial court did not err in denying Horton's motion for JNOV.

As noted, unlike a motion for new trial, the trial court does not have the same broad discretion in ruling on a motion for JNOV. (See *Lane, supra,* 22 Cal.4th at p. 412.) The trial court cannot reweigh the evidence or make credibility findings and can grant the motion only if there is *no* substantial

---

[12]     Where the trial court grants a motion for a new trial but denies a concurrent JNOV motion, the moving party may file a separate cross-appeal as to the denial of the JNOV motion. (See § 629, subd. (d); *Berge v. International Harvester Co.* (1983) 142 Cal.App.3d 152, 158–159.)

evidence to support the verdict. (*Webb, supra,* 63 Cal.4th at p. 192.) Similarly, on appeal, we must presume the correctness of the jury's verdict and uphold the trial court's denial of a JNOV so long as there is any substantial evidence to support that verdict. (*Johnson & Johnson, supra,* 37 Cal.App.5th at pp. 313–314.)

Here, in deciding the motion for new trial, the trial court "independently weighed the evidence and evaluated the credibility of the witnesses," as it is permitted to do sitting as the thirteenth juror. Thus, the trial court determined the evidence did not support the jury's inclusion of at least the $241,222 in allegedly double-counted indirect costs and the $95,416 in allegedly unpaid costs (which Makaden does not dispute on appeal),[13] in reaching its damages award. But the trial court was not permitted to reweigh the evidence or make such credibility findings on the JNOV motion and, although minimal, there was at least *some* evidence to support some of Makaden's claims regarding the calculation of his profit share under the PAPA provision.

Taylor testified he assumed the $241,222 was double-counted, in part, because the column in the job cost report containing that figure was titled "Capitalized Indirect Costs." Andrea, however, explained that those costs were not, in fact, double-counted, but the jury was entitled to weigh the evidence, including the testimony of both Taylor and Andrea, to resolve this factual dispute. Further, while we have concluded the term "Purchase Price

---

[13]     Contrary to Horton's assertion, Makaden's decision not to dispute the $95,416 in the context of the trial court's ruling on the motion for a new trial does not equate to a concession there was *no* substantial evidence to support the *jury's* apparent finding that the $95,416 should not have been deducted. As we have explained, the standards of review for the two motions are significantly different.

paid to Seller for each Lot" is ambiguous as a matter of law, resolving that ambiguity requires consideration of the extrinsic evidence—including weighing the testimony of Doyle and Stearn—to determine the mutual intent of the parties.[14] While we agree that it may be difficult for Makaden to establish damages in an amount greater than $533,694 at a third trial, we cannot conclude that there was *no* substantial evidence to support any of Makaden's positions, and thus the trial court did not err by denying the JNOV motion.[15]

Horton asserts the maximum damages award has now been determined by the court and the outcome of a third trial will be the same. To the contrary, neither the trial court nor this court has determined the proper deductions as a matter of law. Instead, as we have explained, the trial court, sitting as the thirteenth juror, independently weighed the evidence and concluded the jury's calculation of damages was erroneous. The trial court was entitled to do so on a motion for a new trial, but was not entitled to do so

---

[14] Horton contends Doyle's admission that he understood the PAPA provision was going to include the full land acquisition cost for all 59 lots forecloses any further dispute on this issue. Although persuasive, Doyle's testimony alone is not dispositive under the relevant standard of review for a JNOV. Makaden also presented at least some evidence the deduction for the "Purchase Price" in the PAPA formula was limited to the $2,905,000 figure set forth in the Cox Contract of Sale.

[15] We also note, as the trial court did, that the jury appears to have used the calculation that awarded Makaden 50 percent of the profits over the stated gross profit margin threshold of 22 percent. Although Horton conceded for the purpose of its posttrial motions that Makaden was entitled to 50 percent and also does not dispute that finding in its cross-appeal now, it contends it could still assert Makaden is entitled only to 35 percent under the amended Cox Contract of Sale in a new trial on damages. Thus, the damages award could potentially be reduced further.

in the context of a JNOV motion. (See *Lane, supra,* 22 Cal.4th at p. 412.) For the same reason, the primary case on which Horton relies, *Simon v. San Paulo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, is not helpful. There, the issue was whether the punitive damages award was excessive, and that "is a legal issue appellate courts determine independently." (*Id.* at p. 1187.) Here, at least some of the issues underlying the damages award are factual disputes that a jury must decide. (See *Ibid.* ["we do not, in determining the maximum constitutional award ourselves, decide any question of fact plaintiff has a right to have decided by a jury"].)

We therefore conclude the trial court did not err by denying Horton's alternative JNOV motion.

## II.

### *The Trial Court Did Not Err By Vacating the Prejudgment Interest*

Makaden asserts the trial court erred in granting Horton's motion to vacate the portion of the judgment awarding prejudgment interest to Makaden. Again, we disagree.

Civil Code section 3287, subdivision (a), provides, in relevant part, "[a] person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day." If the requirements of Civil Code section 3287, subdivision (a), are met, an award of prejudgment interest is mandatory. (*North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828–829.) "Damages are certain or capable of being made certain by calculation, or ascertainable, for purposes of the statute if the defendant actually knows the amount of damages or could calculate that amount from information reasonably available to the defendant. [Citation.] In contrast, damages that must be determined by the

38

trier of fact based on conflicting evidence are not ascertainable." (*Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 150–151.) "The denial of prejudgment interest under [Civil Code] section 3287, subdivision (a) presents a question of law" that we independently review. (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 347; see also *Tenzera, Inc. v. Osterman* (2012) 205 Cal.App.4th 16, 21.)

Makaden contends the requirements of Civil Code section 3287, subdivision (a), were met in this case because the PAPA formula was set forth in the Cox Contract of Sale and had all the information necessary to calculate the correct PAPA payment using that formula. However, the statute does not require an award of prejudgment interest "where the amount of damage, as opposed to the determination of liability, 'depends upon a judicial determination based upon conflicting evidence and is not ascertainable from truthful data supplied by the claimant.' " (*Fireman's Fund Ins. Co. v. Allstate Ins. Co.* (1991) 234 Cal.App.3d 1154, 1173.) Here, although the contract contained a formula for determining the PAPA payment, the formula was complex and included lengthy definitions of each of the variables. Moreover, the parties had both legal disputes regarding the proper interpretation of the definitions and factual disputes regarding whether certain enumerated costs should be included under those definitions. For example, as we have just discussed, whether the $241,222 was properly double-counted was largely a factual dispute. The amount of damages was not capable of being determined absent resolution of those disputes and, thus the statute does not compel an award of prejudgment interest in this case. (See *ibid*.)

Makaden relies on *State of California v. Continental Ins. Co.* (2017) 15 Cal.App.5th 1017 to assert the damages were certain because Horton *could* have calculated them *if* it had known how the trial court would rule on the legal issues. (*Id*. at p. 1043.) As an initial matter, unlike the present case, *Continental* is an insurance coverage case, and the court specifically limited its analysis to that context. (*Id*. at pp. 1039 ["At least in insurance cases, what has been treated as controlling is whether the uncertainty is legal or factual."], 1042 ["Collectively, [the cases analyzed] stand for one simple test: When the allocation of indemnity among insurers turns on factual issues, damages are uncertain and pretrial interest is unavailable; when it turns exclusively on legal issues, damages are certain and pretrial interest is available."].) Regardless, the disputes at issue here were not purely legal. As we have already discussed, at least some of them, such as whether the $241,222 for indirect costs was double-counted, were primarily factual disputes. Indeed, Makaden belies its own position by asserting the trial court properly denied the JNOV motion because the court was not permitted to weigh the evidence or make credibility determinations in that context. If the trial court could not determine the amount of damages as a matter of law in the context of the JNOV, it follows that the damages calculation was not based solely on legal issues.

Makaden also asserts this case is similar to *Cheema v. L.S. Trucking, Inc.* (2019) 39 Cal.App.5th 1142. It is not. " 'The principal issue in [*Cheema*] was the effect of a verbal agreement between the parties under which LS Trucking agreed to purchase the box that was on a Super Dump truck that Cheema had purchased." (*Id*. at pp. 1146–1147.) After determining the alleged agreement was not enforceable, the trial court awarded damages to Cheema to compensate it for rent it had paid, less an offset for payments

made by LS Trucking for the box, but refused to award prejudgment interest. (*Id*. at pp. 1147–1148.)  The appellate court concluded the trial court erred and explained there was no real dispute or uncertainty over the *amount* of damages owed, only a legal dispute concerning liability, which did not render the damages unascertainable.  (*Id*. at pp. 1149, 1151.)  To the contrary, here, as we have discussed, the primary issues at trial and on appeal concern the *amount* of damages owed.  Again, Makaden belies its own position by asserting, in opposition to Horton's cross-appeal on the JNOV motion, that it may present additional fact evidence at a new trial *limited to damages*.  Even now, in Makaden's view, there remains a factual dispute regarding the *amount* of damages.

We therefore conclude the trial court did not err by granting the motion to vacate the award of pre-judgment interest.

III.

*We Decline to Address the Trial Court's Ruling on the Motion for Nonsuit*

As a final matter, Makaden asks this court to provide what would be an advisory opinion on the trial court's granting of Horton's motion for nonsuit on the breach of implied covenant of good faith and fair dealing cause of action.  We decline to do so.

The proper mechanism for addressing the trial court's ruling on a nonsuit is through an appeal from the underlying judgment.  (See *McKee v. Lynch* (1940) 40 Cal.App.2d 216, 228 ["An order denying a motion for nonsuit is not an appealable order but may be reviewed on the appeal from the judgment."].)  Here, there is no judgment as it was vacated when the trial court conditionally granted Horton's motion for new trial and Makaden refused to accept the reduced remittitur.

41

Makaden asserts we should nevertheless decide the issue pursuant to section 906,[16] because, Makaden asserts, it is relevant to the issues on appeal and may be relevant on remand.  To the contrary, Makaden's claim of breach of implied covenant of good faith and fair dealing was tied directly to the amendment reducing the percentage of gross profits owed to Makaden from 50 percent to 35 percent.  However, there is no dispute the jury adopted the 50 percent rate in its damages calculation, despite the court's ruling on Horton's motion for nonsuit.  Horton did not dispute the 50 percent profit participation rate for the purposes of its posttrial motions and, similarly, does not dispute the 50 percent rate on appeal.  Thus, the matter is not relevant to any issue on appeal.

Makaden asserts Horton "most probably will argue the 35 percent calculation is the appropriate measure of damages in the upcoming [third] trial," and therefore asks us to provide guidance on remand.  Makaden's assertion is purely speculative.  Further, as it did in the last trial, Makaden will be permitted to argue the 50 percent rate applies, and it is possible the jury will once again apply the 50 percent rate, even despite the trial court's ruling on the motion for nonsuit.  Further still, if the parties do proceed to a third trial and the jury does instead adopt a profit participation rate of 35 percent, Makaden will have an opportunity to address the issue on a proper appeal from the resulting judgment.

---

16      Section 906 provides, in relevant part, "[u]pon an appeal pursuant to Section 904.1 or 904.2, the reviewing court may review the verdict or decision and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party."

## DISPOSITION

The orders are affirmed.  Horton is entitled to its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

DO, J.

WE CONCUR:


HALLER, Acting P. J.


O'ROURKE, J.